**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| AMERICAN TRAFFIC SOLUTIONS, INC. | § | No.  1:12-CV-00504 |
| | § | |
| Plaintiff, | § | Jury Trial Demanded |
| | § | |
| v. | § | |
| | § | |
| B&W SENSORS LLC, | § | |
| | § | |
| Defendant. | § | |
| | § | |

**<u>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>**

Plaintiff American Traffic Solutions, Inc. ("ATS") respectfully requests that the Court preliminarily enjoin Defendant from infringing United States Patent No. 8,184,863 (claims 1, 16, and 21) and United States Patent No. 8,213,685 (claims 1, 25, 52, 54, 81, 85, and 110) until such time as a final judgment is entered in this action.

## I.  BACKGROUND

ATS is the sole owner of all right, title, and interest in U.S. Patent No. 8,184,863 ("the '863 patent") and United States Patent No. 8,213,685 ("the '685 patent") (collectively "the patents-in-suit") and has the sole right to sue for infringement thereof.  *Declaration of Adam Tuton* ("*Tuton Decl.*"), ¶ 6 (filed herewith).  The patents-in-suit are generally directed to video speed detection ("VSD") systems, which allow vehicle speeds to be determined for numerous purposes, including public safety, traffic flow analysis/regulation, and law enforcement.

ATS has been in the automated traffic safety camera business since 1992.  Through its investment of significant resources and effort, ATS has become an industry leader, and its traffic safety photo enforcement technology has become a valuable public safety measure to enforce traffic safety laws, including those governing speeding in school zones and stopping at red lights.

ATS has patented technology directed to multi directional, multiple lane, VSD technology that allows customers — primarily municipalities and law enforcement agencies — to conserve valuable public resources (such as police officer resources) and apply them to more significant criminal investigations.  The patented technology is one of several advances in the field of automated speed enforcement.  This field has seen the introduction of a number of technologies directed towards the use of automated speed measuring devices to measure vehicle speeds and trigger high speed cameras to take photographs of speeding vehicles.  Traditional speed detection technology includes manually-operated RADAR (i.e., "radio detection and ranging") or LiDAR (i.e., "laser light detection and ranging") systems.  Because of the growth in the market demand, new systems are emerging.  Among the technologies gaining acceptance by law enforcement agencies, legislatures and the courts are camera units that utilize RADAR and LiDAR sensors to measure vehicle speed and then capture and record photographs and/or video

1

of the observed vehicle. The images are used to identify the registered owners of offending vehicles, to whom citations can be issued.  In ATS's patented system, VSD technology is used in place of RADAR, LiDAR, or other competitive systems.

While ATS's patented VSD technology provides significant advantages over prior speed detection systems, it also must meet ATS's exacting standards for reliability and robustness.  *Tuton Decl*. ¶ 7.   In law enforcement, it is crucial that vehicle speeds obtained by speed measuring devices are accurate and credible.   Speed measuring devices typically must undergo certain rigorous testing and certification procedures to ensure their accuracy and compliance to defined specifications.  Personnel that operate speed measuring devices are also required to receive proper training on the correct operation of the devices.  *Id.*  A significant investment of time and resources is necessary to develop and obtain certification of a system incorporating ATS's patented VSD technology robust enough to obtain widespread commercial success and reliable enough to secure law enforcement, judicial and legislative acceptance.  *Id.* ¶ 8.

After ATS (and its predecessor) developed and filed patent applications on its VSD technology, Defendant (a relative new-comer to the automated traffic safety enforcement market) began producing VSD technology, which it  markets under the name Multiple Vehicle Speed Tracking System ("MVST" or "the Accused Device").  *Id.* ¶ 9.  Defendant's MVST system infringes the claims of the patents-in-suit.  Even though Defendant knows about ATS and its patented VSD technology, Defendant falsely and misleadingly claims that it was the first and only company to develop the patented multi directional, multiple lane, VSD technology.  *Tuton Decl.*, Ex. 5 (quoting B&W's founder John Baine stating as to the MVST product "Nobody has the technology that we have, … It's unique.  It's new.  And it's based on pure science.").

To add insult to injury, Defendant markets its MVST product in direct competition with a different ATS product (the AutoPatrol™ speed camera system) and has successfully leveraged its infringing product to obtain lucrative, long-term multi-year contracts targeted at several existing and established ATS customers.  *Tuton Decl.* ¶¶ 9-10. Because traffic safety

enforcement systems are often sold through long-term contracts, Defendants' actions are costing ATS customers it may never get back.  *Tuton Decl.* ¶ 11.

Defendant's infringement is irreparably damaging ATS's business, reputation, and goodwill in ways that cannot be fully quantified in terms of money damages.  There is no overriding public interest that weighs against preliminarily enjoining Defendant from marketing its infringing VSD technology.  To the contrary, the public interest will be served by having reliable VSD technology from the original inventor used by municipalities and law enforcement agencies rather than controversial, unreliable knock-offs.  The requested relief will also serve equity and the public interest by rewarding innovation and protecting patent rights.

## II.  ATS IS ENTITLED TO AN INJUNCTION

The U.S. Patent Act, 35 U.S.C. § 283, protects the intellectual property rights in a patented invention by empowering courts to grant preliminary injunctions to "prevent the violation of any rights secured by patent, on such terms as the court deems reasonable."  This Court's injunctive power furthers the express Constitutional purpose of the patent laws by promoting progress of the useful arts and by protecting the full value of a patent owner's invention in the marketplace.

Because an appeal from a patent infringement case falls within the exclusive jurisdiction of the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit"), motions to preliminarily enjoin such infringement are governed by the Federal Circuit's four part test for determining whether to award injunctive relief in patent cases.  In applying this test, courts consider:

A.  Whether the moving party is likely to succeed on the merits;

B.  Whether the moving party will suffer irreparable harm if a preliminary injunction is not granted;

C.  Whether the balance of hardships tips in favor of the moving party or the opponent (i.e., whether the threatened injury to the movant if the injunctive relief is denied outweighs the possible harm to the infringer if such relief is granted); and

D.  Whether the grant of preliminary injunctive relief will adversely affect the public interest.

*High Tech Med. Instr., Inc. v. New Image Indus.*, 49 F.3d 1551, 1553 (Fed. Cir. 1995). The purpose of a preliminary injunction is to preserve the parties' *status quo ante* until a trial on the merits can be held. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998) (affirming preliminary injunction).

Likelihood of success is a significant preliminary injunction factor. In exercising its discretion, the Court must also balance the rights of the parties along with the possible injuries to each which may result from the granting or withholding of injunctive relief. The standard for a preliminary injunction does <u>not</u> require, however, the plaintiff to prove a full case on the merits, as would be necessary to secure a permanent injunction after trial. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.")

### III.  ATS IS LIKELY TO SUCCEED ON THE MERITS.

This case presents a simple and compelling instance of patent infringement.

### A.    Defendant is Infringing the Patents-in-Suit.

The first factor to be considered in determining whether to preliminarily enjoin Defendant from continued infringement of ATS's patents-in-suit is the likelihood that ATS will prevail at trial. "[T]he grant of a preliminary injunction does not require that infringement be proved beyond all question, or that there be no evidence supporting the viewpoint of the infringer." *H.H. Robertson, Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 387 (Fed. Cir. 1987). Moreover, "[t]he standards applied to the grant of a preliminary injunction are no more nor less stringent in patent cases than in other areas of the law." *Id.*

In order to demonstrate a reasonable likelihood of success on the merits, ATS must show, in light of the presumptions and burdens that will apply at trial:  (1) that Defendant is infringing the patents-in-suit, and (2) that the patents-in-suit are valid.

In analyzing patent infringement, the following two-step test applies:

(1)     The patent claim language must be interpreted to determine the scope and meaning of the claims; and

(2)     The accused device must be compared to the properly interpreted claim language to determine whether the device falls within the scope of the claim.

*Markman v. Westview Instr.,* 52 F.3d 967, 976 (Fed. Cir. 1995) *aff'd,* 166 S. Ct.  1384 (1996).

In *Markman,* the Federal Circuit established the principle that "interpretation and construction of patent claims, which define the scope of the patentee's rights under the patent, is a matter of law exclusively for the court." *Markman,* 52 F.3d at 970-71.  In order to interpret a claim, "the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, specification and, if it is in evidence, the prosecution history." *Vitronics Corp. v. Conceptronics, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996).  The words in a claim are to be given their ordinary and customary meaning at the time of the invention.  If a meaning other than the ordinary usage is desired, the patentee must clearly define that term in the patent specification.  *Id.*  However, all claims must be read in view of the specifications of which they are a part, with the specification being "the single best guide to the meaning of a disputed term." *Id.*  Finally, courts may consider the prosecution history of the patent, which may contain express representations by the patent applicant regarding the scope of the claim, or which may explain the origin, and therefore the intent, of certain claim language.

If the public record (i.e., the intrinsic evidence) unambiguously describes the scope of the patented invention, reliance on extrinsic evidence is needless and improper.  *Id.*  Following claim construction, the next step is to determine whether the claim as properly construed reads on the accused infringer's product or method or, in other words, is infringed.  *Laitram Corp. v. Morehouse Indus. Inc.,* 143 F.3d 1456, 1461 (Fed. Cir. 1998); *Carroll Touch, Inc. v. Electro Mechanical Sys.,* Inc., 15 F.3d 1573, 1576 (Fed. Cir. 1993).

Although the patent specification is to be considered when interpreting the claims, specific embodiments of the invention disclosed in the specification must <u>not</u> be used to limit the scope of the claims.  *Laitram Corp. v. Cambridge Wire Cloth Co.,* 863 F.2d 855, 865 (Fed. Cir. 1988); *Young Dental Mfg. Co. v. Q3 Special Products, Inc.,* 112 F.3d 1137, 1143 (Fed. Cir.

1997) ("limitations may not be read into the claims from the specification"); *Wright Medical Tech., Inc. v. Ostenonics Corp.*, 122 F.3d 1440, 1443 (Fed. Cir. 1997) ("Claim terms are given their ordinary and customary meaning in the field of the invention, unless a special definition is clearly stated in the specification.")  An accused infringer "cannot alter the plain meaning of the claim language by referring to parts of the specification out of context."  *Seal-Flex, Inc. v. Athletic Track & Court Constr.*, 172 F.3d 836, 845 (Fed. Cir. 1999).

### 1.    DEFENDANT IS INFRINGING THE '863 PATENT.

#### a.    Interpretation of the relevant claims of the '863 Patent

One of the patents at issue in this case is the '863 patent, attached hereto as <u>Exhibit 1</u> to the concurrently filed *Declaration of Jigang Wang*  ("*Wang Decl.*") ¶ 4 and Ex. 1.  The '863 patent's claims generally cover VSD systems.  The precise scope of the inventions covered by the '863 patent is determined by the language of the patent's claims, which, under *Markman* and its progeny, must first be construed by the Court:

> The claims of the patent provide the concise formal definition of the invention. They are numbered paragraphs which 'particularly [point] out and distinctly [claim] the subject matter which the applicant regards as his invention.' 35 U.S.C. § 112 .  It is to these wordings that one must look to determine whether there has been infringement.  (Footnote omitted).

*E.I. du Pont de Nemours & Co.  v. Phillips Petroleum*, 849 F.2d 1430, 1433 (Fed. Cir. 1988) (*quoting Autogiro Co. of America v. United States*, 384 F.2d 391, 395-96 (Ct.  Cl.  1967).

Courts construe claims by considering the evidence necessary to resolve disputes about claim terms and to assign a fixed, unambiguous, legally operative meaning to the claim. *Vitronics*, 90 F.3d at 1582.  Following these guidelines, claims 1, 16, and 21 of the '863 patent should be construed, as set forth below.

#### b.    Language of the Independent Claims of the '863 Patent

The '863 patent contains 21 claims.  <u>Claims 1, 16, and 21 are the only independent claims recited and the only claims asserted for the purposes of this preliminary injunction</u>. Claims 1, 16, and 21 are all apparatus claims directed to the structure and components of a VSD system.  The literal language of claims 1, 16, and 21, as issued by the PTO, is as set forth in the

'863 patent and in the center column of the claim charts attached to the *Wang Declaration* ¶ 6 and Ex. 4 (filed herewith).

### c.      The Specification of the '863 Patent

To determine whether an inventor has given special meaning to words used in a claim, the patent specification is examined for a definition that differs from common usage. *Vitronics,* 90 F.3d at 1582. Each of the claims must be read in view of the specification. *Markman,* 52 F.3d at 979; *Autogiro Co. of Am.,* 384 F.2d at 397. In reviewing the specification of the '863 patent, the inventor used the claim terms according to their plain ordinary meaning. It is a fundamental canon of claim construction that the plain ordinary meaning of patent terms controls, unless the specification indicates that the inventor intended to give them a different or special meaning. *Phillips v. AWH Corp.*, 415 F.2d 1303, 1312-7 (Fed. Cir. 2005) (*en banc*). While dictionaries may be helpful in resolving disputes over what the plain ordinary meaning in the English language of a particular claim term is, they (as extrinsic evidence) cannot trump the intrinsic evidence. The key claim terms and their corresponding meanings are outlined as follows:

| **Claim Term** | **Meaning** |
| --- | --- |
| camera | camera |
| computer | computer |
| objects | objects |
| calibration | calibration |
| homographic | using projective mapping |
| linear fit comparison | compared to a line |
| mount | mount |
| speed | speed |
| compare | compare |
| data | Data |

### d.      File History of the '863 Patent

Throughout the prosecution history of the '863 patent, all terms found in the claims were used in their customary sense in the English language. Nor did the patentee act as his own

"lexicographer" in assigning a special meaning or gloss to any of the terms.  Accordingly, there is nothing in the intrinsic evidence of the prosecution history that supports attaching any meaning to the claim terms other than their plain ordinary meaning.

### e.        No Extrinsic Evidence is Required

In interpreting claims, extrinsic evidence should only be relied upon if there is a "genuine ambiguity in the claims, after consideration of all available intrinsic evidence." *Vitronics,* 90 F.3d at 1584.  No extrinsic evidence is required in this case, since the claim terms to be interpreted are not ambiguous.

### f.        Claim Construction/ Infringement Charts

With the foregoing law in mind, ATS respectfully submits that Claims 1, 16, and 21 of the '863 patent should be construed as set forth in the underlined infringement claim charts attached to the *Wang Declaration* ¶¶ 5-6 and Ex. 4.  In those claim charts, the claim language is set forth in the first column, the proposed construction per the intrinsic evidence and ordinary meaning of terms in the second column, and the corresponding elements of Defendant's infringing system in the third column.  *Id*.   As shown in the claim charts, literal infringement is apparent.

### 2.      DEFENDANT ALSO INFRINGES THE '685 PATENT.

### a.        Interpretation of the relevant claims of the '685 Patent

The second patent-in-suit is the '685 patent.  *Wang Decl*. ¶ 4 and Ex. 3.  The '685 patent's claims also generally cover VSD systems.  The precise scope of the inventions covered by the '685 patent is determined by the language of the patent's claims, which must first be construed by the Court.  Plaintiff respectfully suggests that claims 1, 25, 52, 54, 81, 85, and 110 of the '685 patent should be construed, as set forth below.

### b.        Language of the Independent Claims of the '685 Patent

The '863 patent contains 134 claims, of which Claims 1, 25, 49, 51-54, 80-85, and 110 are the only independent claims.  Claims 1, 49, and 51-54  are system claims directed to a system for monitoring compliance of moving vehicles on a roadway subject to a speed limit.   Claims 25, 80-85, and 110 are method claims directed to a method for monitoring compliance of moving

vehicles on a roadway subject to a speed limit.  <u>For the purposes of this preliminary injunction, only the asserted independent claims 1, 25, 52, 54, 81, 85, and 110 are asserted</u>.

The literal language of claims 1, 25, 52, 54, 81, 85, and 110, as issued by the PTO, is as set forth in the '685 patent and in the center column of the claim charts attached to the *Wang Declaration* ¶ 7 and Ex. 5.

**c.**      **The Specification of the '685 Patent**

As with the '863 patent's terms — and for the same reasons discussed above — the plain ordinary meaning of '685 patent's terms controls.  *Phillips*, 415 F.2d at 1312-7.  The key claim terms and their corresponding meanings are outlined as follows:

| <u>Claim Term</u> | <u>Meaning</u> |
|---|---|
| tracking camera | a camera that creates images suitable for tracking |
| images | images |
| measurement | measurement |
| timing | timing |
| image | image |
| captured | captured |
| processing unit | a computer processor |
| coupled | coupled |
| configured | configured |
| detect | detect |
| vehicle | vehicle |
| moving | moving |
| determine | determine |
| real-world | real-world |
| position | position |
| access | access |
| calculate | calculate |
| GUI | graphic user interface |
| live video | live video |

9

| update | update |
|---|---|

**d.    File History of the '685 Patent**

Throughout the prosecution history of the '863 patent, all terms found in the claims were used in their customary sense in the English language.   Nor did the patentee act as his own lexicographer in assigning a special meaning or gloss to any of the terms.   Accordingly, there is nothing in the intrinsic evidence of the prosecution history that supports attaching any meaning to the claim terms other than their plain ordinary meaning.

**e.    No Extrinsic Evidence is Required**

No extrinsic evidence is required — the claim terms are not ambiguous.

**f.    Claim Construction/ Infringement Charts**

ATS respectfully submits that claims 1, 25, 52, 54, 81, 85, and 110 of the '685 patent should be construed as set forth in the underlined infringement claim charts attached to the *Wang Declaration* ¶¶ 5 and 7 and Ex. 5.   In those charts, the claim language is set forth in the first column, the proposed construction according to the intrinsic evidence and ordinary meaning of terms in the second column, and the corresponding elements of Defendant's infringing system in the third column.   *Id.*   Again, literal infringement is apparent as shown in the claim charts.

**B.    The Patents-in-Suit are Valid.**

The patents-in-suit enjoy a presumption of validity.   35 U.S.C. § 282 provides that:

> A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims. Dependent claims ... shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

The statutory presumption of a patent's validity rests, in part, on the rigors of the process which a patent application must survive before the USPTO will issue a new patent.   As previously described, this process includes a thorough examination of "prior art" to ensure that a claimed invention is sufficiently unique to deserve the significant protections which patents afford.

In opposing ATS's request for a preliminary injunction, Defendant bears the burden of proving that any claim of either of the patents-in-suit is invalid by the enhanced standard of clear and convincing evidence.  *H.H. Robertson.*, 820 F.2d at 390; *Finnigan Corp. v. Int'l Trade Comm.,* 180 F.3d 1354 (Fed. Cir. 1999).  The law is clear that even if Defendant were to produce evidence that was not cited during the prosecution of the patents-in-suit, such evidence may only be considered by a court if it is determined to be more relevant than the prior art considered by the Examiner in the USPTO.  *See  Dennison Mfg. Co. v. Panduit Corp.*, 475 U.S. 809 (1986) (per curiam); *Baxter Healthcare Corp. v. Spectramed, Inc.,* 49 F.3d 1575, 1580-81 (Fed. Cir.), *cert denied,* 116 S. Ct. 272 (1995); *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561 (Fed. Cir. 1987); *Carella v. Starlight Archery,* 599 F.2d 135 (Fed. Cir. 1986).

## IV.  ATS WILL SUFFER IRREPARABLE HARM IF A PRELIMINARY INJUNCTION IS NOT ISSUED AGAINST B&W'S INFRINGEMENT.

ATS will suffer irreparable harm, including lost market share for existing and future products, lost business opportunities, and lost customer goodwill, as a result of Defendant's infringing conduct.  It is well established in the context of patent infringement actions, "[p]rice erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm" and that where such losses are likely, "the mere possibility of future monetary damages does not defeat a motion for preliminary injunction."  *See Celsis In Vitro, Inc. v. Cellzdirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) (citing *Abbot Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1362 (Fed. Cir. 2008)); *see also Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1306 (Fed. Cir. 2012) (affirming permanent injunction irreparable harm finding based on "considerable lost market share and price erosion").

Here, ATS has and will continue to suffer irreparable harm due to Defendant's use of ATS's patented technology to directly compete with ATS and its competing products.  ATS has spent approximately 20 years developing its reputation as a significant player in the market for automated traffic enforcement systems.  *Tuton Decl.* ¶¶ 4-5.  ATS's speed camera systems, such as the AutoPatrol™ Radar-based system, provide a tremendous advantage to ATS's customers

because of the simplicity of their operation and their record of reliability. *Id.* ¶ 10. Defendant's infringing activities are causing ATS to suffer a loss of reputation and goodwill throughout the industry ATS services. The harm which ATS has suffered, and continues to suffer, is neither speculative nor merely imminent, but is occurring and accruing right now. *Id.* ¶¶ 11-12. <u>This is true whether the parties offer competing products that use the same technology or whether they offer products that work differently but perform the same function, and thus are substitutes from the customer's perspective.</u>[1] *See, e.g., Broadcom Corp. v. Qualcomm*, 543 F.3d 683, 702-03 (Fed. Cir. 2008) (affirming irreparable harm where plaintiff did not currently practice the patented inventions and plaintiff's existing products and infringing products competed as "substitutes" for each other in the market); *Baker Hughes Inc. v. Nalco Co.*, 676 F. Supp. 2d 547, 554 (S.D. Tex. 2009) (finding irreparable harm, in part, based on lost sales and market share with respect to "functionally related products").

Defendant has used its infringing video detection system to target business from multiple, long-term customers of ATS. As a result of this interference, ATS has lost the opportunity to install speed camera systems in Memphis, TN and B&W has directly captured business from long-term ATS customers including the municipality of Country Club Hills, MO, the municipality of Moline Heights, MO, the City of Sugar Creek, MO, and the City of St. Ann, MO. *Tuton Decl.* ¶ 9. Moreover, Defendant is not merely obtaining a scattering of single, one time sales. Rather, Defendant has been able to secure multi-year, multi-unit contracts that provide Defendant with long term relationships developed solely through Defendant's infringing conduct.[2] Defendant is also relying on its infringing product to bid in competition with ATS for a proposed five-year contract to provide up to 300 speed detection cameras to the City of

---

[1] Notably, B&W expressly markets its infringing MVST system as being "more accurate than the latest generation of laser, radar or street-embedded sensors" such as the systems currently sold by ATS in competition with B&W's infringing system. *Wang Decl.*, Ex. 6.

[2] Ironically, it appears that the form of agreement Defendant has been using with its customers was copied, in many places verbatim, from the form ATS has long used with its red light camera and speed enforcement camera customers. *See Tuton Decl.* ¶ 9.

Chicago, Illinois, worth millions of dollars, as well as a proposed contract to install and monitor traffic cameras in school zones within the City of Youngstown, Ohio. *Tuton Decl.* ¶ 10. *See, e.g., Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142 (Fed. Cir. 2011) (concluding trial court committed clear error in declining to find irreparable harm where the record contained evidence of direct competition, loss of market share, and price erosion); *Graphic Packaging Intern., Inc. v. C.W. Zumbiel Co.*, 2012 WL 3536983, *2 (M.D. Fla. Aug. 15, 2012) (finding irreparable harm where evidence demonstrated that Defendant sold an infringing product and submitted competing bids to sell that product to Plaintiff's customers).

Once a customer is lost to a competitor, the chances that the customer will ever return to ATS are extremely remote. *Tuton Decl.* ¶ 11. As such, when ATS loses a customer to the Defendant, ATS will, in all probability, never be able to get that customer back. *Id.*

Second, ATS's future business opportunities and customer goodwill are further damaged because Defendant is deploying its infringing video traffic enforcement products before those products are reliably functional and before Defendant has obtained legislative and law enforcement acceptance of the technology. *Tuton Decl.* ¶ 12. Defendant's conduct has undermined customer interest in and public receptiveness to this technology as a whole, which destroys ATS's ability to successfully build a market for its patented video traffic enforcement technology. *See* Tuton Decl. ¶ 12 and Exs. 3-4.

Such acts undermine the market, goodwill, and business opportunities for the patentee's product are grounds to find irreparable harm. *See, e.g. Celsis In Vitro, Inc.*, 664 F.3d at 930 (district court properly relied upon evidence that infringement interfered with the growth stage of the patentee's product, including the patentee's relationship with customers, and ability to "distinguish [itself] from competitors," build its brand, expand its customer base, and establish a reputation for leadership in the market); *I4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 861-62 (Fed. Cir. 2010) (affirming finding irreparable harm for permanent injunction where infringer's conduct foreclosed business opportunities for patented product, forcing patentee to change the focus of its product offerings away from the patented product).

13

This is particularly true where the parties are competing to develop a new technology or emerging market, because in these circumstances, the infringer's premature entry into the market (or entry before the patentee can capture the market) with an infringing product is particularly likely to permanently foreclose or limit the success of the patentee's products. *See, e.g., Baker Hughes Inc. v. Nalco Co.*, 676 F. Supp. 2d 547, 553-54 (S.D. Tex. 2009) (finding irreparable harm for preliminary injunction where infringing process threatened to capture nascent, niche market that both patentee and infringer were competing to successfully develop); *see also, e.g. Butamax Advanced Biofuels LLC v. Gevo, Inc.*, Civ. No. 11-54-SLR, 2012 U.S. Dist. LEXIS 84608 at *35-37 (D. Del. June 19, 2012) (holding that patentee established irreparable harm based on infringer's entry as the first party in the relevant, nascent market would establish irreparable harm, but for finding that patentee likely could not prove infringement).

Unless Defendant is preliminarily enjoined from infringing the patents-in-suit, ATS stands to permanently lose its investment in time, resources, and reputations in the creation and development of its market for its VSD. *Tuton Decl.* ¶¶ 11-12.  Put another way, if Defendant is allowed to continue polluting the market with its infringing products during the term of ATS's patents-in-suit, Defendant's actions will have a substantial and devastating impact on ATS's market share and pricing structure that can never be quantified in monetary terms. *Id.*

Moreover, Defendant is a relative upstart in the automated speed enforcement market and appears to lack adequate financial resources and technical sophistication. *Tuton Decl.* ¶¶ 9, 12. Where, as here, the infringing party is a relatively small company with limited resources, the fact that it may never be able to pay a damages award sufficient to fully compensate the patentee's monetary losses as a result of the infringement also favors granting injunctive relief. *See Robert Bosch*, 659 F.3d at 1155 ("A district court should assess whether a damage remedy is a meaningful one in light of the financial condition of the infringer before the alternative of money damages can be deemed adequate.") (citing cases).

## V.  EQUITY FAVORS THE ISSUANCE OF A PRELIMINARY INJUNCTION TO PREVENT FURTHER PATENT INFRINGEMENT.

If the Court finds that Plaintiff has made a strong showing of patent infringement and validity, it should not consider the Defendant's potential loss of customers as suggesting a legitimate "hardship" or militating against preliminary relief.  *See, e.g., Total Containment, Inc. v. Environ Products, Inc.,* 23 USPQ2d (BNA) 1305, 1307 (E.D. Pa. 1992) (finding that when infringement and validity are clear, a loss of business based on infringing sales should not deter injunctive relief); *Laitram Corp. v. Rexnord, Inc.,* 15 USPQ2d 1161, 1175 (E.D. Wis. 1990) (finding that "the loss of customers of businesses built upon the sale and use of infringing products does not amount, in the context of a patent infringement suit, to irreparable harm"); *Ethyl Molded Products Co. v. Betts Package, Inc.,* 9 USPQ2d 1001, 1039 (ED. Ky. 1988) (noting that "it is an abuse of discretion to deny an injunction on [the] grounds that the injunction might put [an] infringer out of business.")

Nor can Defendant argue that it is small, relatively new startup, while ATS is a well-established presence in the market.  "A party cannot escape an injunction simply because it is smaller than the patentee or because its primary product is an infringing one." *Robert Bosch*, 659 F.3d at 1156 (citing *Windsurfing Int'l v. AMF, Inc.*, 782 F.2d 995, 1003 n. 12 (Fed. Cir. 1986) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."). Likewise, the Court may also properly ignore the expenses Defendant may have incurred in creating the infringing products or the cost of redesigning them. *See I4i Ltd. Partnership*, 598 F.3d at 863 ("neither commercial success, nor sunk development costs, shield an infringer from injunctive relief.").  In effect, without a preliminary injunction, ATS will be required to compete against a knock-off of its own patented invention, placing a substantial hardship on ATS.  For all these reasons, this factor favors entry of a preliminary injunction in this case.

## VI.  THE PUBLIC INTEREST IS SERVED BY A PRELIMINARY INJUNCTION PREVENTING FURTHER PATENT INFRINGEMENT.

The public interest favors the enforcement of ATS's patent rights here. *See Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006) ("We have long acknowledged the importance of the patent system in encouraging innovation.").  Enforcing statutory intellectual property rights and enjoining wrongful appropriation and unauthorized use of patented technology upholds the public's interest in appropriately rewarding previous research and development in a way that fosters future innovation and progress.  In fact, courts have recognized that congressional passage of statutes such as the patent laws "is itself an implied finding by Congress that violations [of the statute] will harm the public." *United States v. Nutri-cology, Inc.,* 982 F.2d 394, 398 (9th Cir. 1992).

The public interest will not be harmed if Defendant is enjoined from continued infringement of the patents-in-suit since ATS is capable of increasing the availability and supply of its speed camera enforcement systems, if needed, to meet any industry demands.  *Tuton Decl*. ¶ 13.  The grant of ATS's requested relief would not jeopardize — and in fact would promote — the public interest, as the requested preliminary injunction would prohibit Defendant from continuing to sell infringing products, from making false statements about the legitimacy, source, ownership, and development of the patented technology, and from spoiling the market for the patented technology through its haphazard promotion and implementation of the infringing system. *Id*. ¶¶ 11-12.

Finally, even if *arguendo* the public interest factor favored neither party, entry of a preliminary injunction is still appropriate here as the balance of the factors weigh overwhelming in  ATS's favor.  *See Robert Bosch*, 659 F.3d at 1156 (finding that although public interest factor was neutral, "the remaining considerations lead to only one reasonable conclusion: plaintiff was entitled to grant of injunctive relief").

## VII.  CONCLUSION

ATS has established all elements required for obtaining a preliminary injunction to prohibit Defendant from continuing to infringe ATS's patents-in-suit.  Accordingly, Plaintiff

ATS respectfully requests that this Court issue the proposed preliminary injunction Order submitted herewith until such time as a final trial on the merits is concluded.

DATED this 18th day of October, 2012.

Respectfully submitted,

ANDY TAYLOR AND ASSOCIATES, P.C.

/s/ Andy Taylor
Andy Taylor
Texas Bar No. 19727600
Andy Taylor & Associates, PC
2668 Highway 36S, #288
Brenham TX  77833
Telephone:  (713) 222-1817
Facsimile:  (713) 222-1855
ATaylor@AndyTaylorLaw.com

George J. Hittner
Texas Bar No. 24038959
American Traffic Solutions, Inc.
1330 West Southern Avenue
Tempe, AZ  85282
Telephone:  (480) 596 4704
Facsimile:  (480) 967 7131
George.Hittner@atsol.com

Brian C. Park (*Pro Hac Vice* pending)
Washington Bar No. 25584
Stoel Rives LLP
600 University Street, Suite 3600
Seattle, Washington  98101-4109
Telephone:  (206) 386-7542
Facsimile:  (206)  386-7500
BCPark@stoel.com

Steven E. Klein (*Pro Hac Vice* pending)
Oregon Bar No. 051165
Nathan C. Brunette (*Pro Hac Vice* pending)
Oregon Bar No. 090913
900 S.W. Fifth Avenue, Suite 2600
Portland, OR  97204
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480
seklein@stoel.com
ncbrunette@stoel.com

Attorneys for Plaintiff
AMERICAN TRAFFIC SOLUTIONS, INC.